U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

SEP 2 8 2010

TONY R.
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

UNITED STATES OF AMERICA

versus

REGGIE COLLIER AND
KIM COLLIER

CIVIL ACTION NO. 08-0686
JUDGE TOM STAGG

## MEMORANDUM RULING

Having heard the oral testimony presented and read the exhibits submitted by the parties, the court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52 and rules as follows:

## I. FINDINGS OF FACT[1]

This case can be summarized as a "battle of the witnesses." It is a classic example of what happens when the result turns on credibility determinations. The testimony offered by the defendants was in conflict with the testimony of each of the witnesses presented by the government. In some cases, credibility may not be a reflection upon the integrity of the individual witnesses and there are justifiable differences of opinion. In a case such a this, no such justifiable difference of opinion exists.

---

[1]The findings of fact are drawn from a combination of the parties' stipulations and facts found by the court from the testimony and exhibits presented.

Reggie Collier ("Mr. Collier"), a Caucasian male, was involved in the management and operation of the Camp Joy Marina, a residential community in Haughton, Louisiana, consisting of rental and owner-occupied condominiums and townhouses, a restaurant and marina. Kimberly Collier ("Mrs. Collier") was president and sole shareholder of Camp Joy Marina, Inc., a corporation organized under the laws of the state of Louisiana. Camp Joy Marina, Inc. owned and/or controlled some or all of the land and improvements at Camp Joy Marina.

Mr. Collier managed Camp Joy Marina from January 1, 2000, until the property was sold on June 8, 2005. He also resided there. Mrs. Collier assisted in managing Camp Joy Marina. She did not directly engage in any discriminatory conduct with respect to Camp Joy Marina from January 1, 2000, until the property was sold on June 8, 2005. Camp Joy Marina, Inc. was dissolved by the filing of an affidavit of dissolution on or about February 15, 2007.

## A.    The Tucker Transaction.

On or about May 14, 2003, Ronald and Sherrell Tucker ("the Tuckers"), residents at Camp Joy Marina, entered into a "Contract For The Lease And Purchase Of Property" in connection with the real property located at 4512 Camp Joy Road in Camp Joy Marina for a purchase price of $65,000.00. The contract was signed by "Kim Collier, President." As down payment for the property, the Tuckers transferred to Camp Joy Marina, Inc., the title of their then-current residence at 4904 Camp Joy Road, which was valued at $25,000.00. They also paid Camp Joy Marina, Inc. $9,200.00 in cash.

2

Under the terms of the contract, the Tuckers were obligated to pay Camp Joy Marina $400 per month until January 1, 2017, at which time title of 4512 Camp Joy Marina would be transferred to them. The contract contained no prohibition on the prepayment of the balance due. The contract did provide that if "Purchaser fails to pay said lease by the monthly due date and go more than 30 days past due, Seller may exercise eviction rights." Trial Ex. 1 at 1. As of October 2004, the Tuckers did not own 4512 Camp Joy Road because they had not yet satisfied the terms of the contract.

In May of 2004, Ronald Tucker ("Mr. Tucker") suffered a heart attack, and the Tuckers decided to sell 4512 Camp Joy Road and move to Arkansas. They retained J.R. Burt ("Burt"), a Caucasian real estate agent licensed under the laws of the state of Louisiana, to list the property and represent them in the sale. When the Tuckers first purchased 4512 Camp Joy Road, Mr. Collier indicated that he wanted a right of first refusal on the property if the Tuckers ever decided to sell. Therefore, Mr. Tucker informed Mr. Collier of his intention to list the property with a realtor. Mr. Collier did not want to purchase the home at that time. According to Mr. Tucker, Mr Collier then told Mr. Tucker to "go ahead and list it with a real estate agent of your choice, but don't sell to blacks, there will be no blacks at Camp Joy Marina." Transcript of Mr. Tucker's Video Deposition at 12. When questioned at trial about this exchange, Mr. Collier denied making this statement. See Trial Transcript Vol. II at 226.

Thereafter, Erin Wilson ("Wilson"), a Caucasian woman, signed a contract to purchase the Tuckers' home. A "sold" sign was placed at the property on top of the original "for sale" sign that had Burt's telephone number on it. Wilson later withdrew

3

her offer to purchase 4512 Camp Joy Road because she concluded the property was too far from Shreveport. Notably, Burt testified that no one called him to ask for Wilson's personal identifying information while the contract was pending. Mr. Collier testified that he did not know Wilson and was never notified that Wilson signed a contract to purchase 4512 Camp Joy Road.

Sometime prior to September 20, 2004, David and Nicole Bennett ("the Bennetts"), both Caucasians, visited the Tuckers' property with their real estate agent, Angela Tatum ("Tatum"). Tatum, an African American, is a real estate agent licensed under the laws of the state of Louisiana, who was retained in 2004 by the Bennetts to represent them in the purchase of a home.[2] Mrs. Bennett was visibly pregnant at the time she viewed the Tuckers' home. Tatum and Mrs. Bennett both testified that while visiting the home, they were not introduced to anyone and did not meet anyone. However, they both testified that during their visit, some neighbors gathered outside who were "rather observant" and "staring." Trial Transcript Vol. I at 130 and 183. They visited the Tuckers' home and another home while at Camp Joy Marina that day.

The Bennetts wanted to look at the Tuckers' home a second time and contacted Tatum to schedule another showing. Tatum and the Bennetts visited Camp Joy a

---

[2]Tatum and Burt worked for the same realty company but in different office locations.

4

second time.[3] Again, they did not meet or speak to anyone but both women again testified that people in the neighborhood were "staring" and "watching." Trial Transcript Vol. I at 132 and 183.

On or about September 20, 2004, the Bennetts made an offer to purchase the Tuckers' home at 4512 Camp Joy Road. The Tuckers accepted the offer on September 27, 2004. Again, a "sold" sign was placed at the property. In addition, Mrs. Tucker contacted Mr. Collier to inform him of the pending sale.

After learning about the proposed sale, Mr. Collier called Burt and requested information about the prospective purchasers. Mr. Collier informed Burt that before Camp Joy Marina would execute any deed, he wanted some identifying information about the purchasers. The testimony was consistent from both Burt and Mr. Collier that during this phone conversation, Mr. Collier told Burt that he "did not want those kind of people" living at Camp Joy. Trial Transcript Vol. I at 164-65 and Trial Transcript Vol. II at 32. Burt testified that he understood that statement by Mr. Collier to refer to African Americans. Trial Transcript Vol. I at 172. Burt, however, also admitted that he was aware of the fact that Tatum was African American and presumed that her clients were also African American in light of Mr. Collier's comments about "those kind of people." See id. at 175.

Mrs. Collier testified that she was present at the time of the phone call from

---

[3]Tatum testified that on the second visit, she and the Bennetts were accompanied by another family member of the Bennetts. Mrs. Bennett testified that only she and her husband were present for the second viewing of the home.

5

Mr. Collier to Burt and that Mr. Collier specifically mentioned wanting to exclude sex offenders and drug dealers before he used the phrase "those kind of people."[4] Trial Transcript Volume II at 285. Mr. Collier also testified to this effect. See id. at 233. Mr. Collier also testified that he told Burt that he needed information on the prospective purchasers in order to draw up a maintenance agreement. See id. Burt did not have any recollection of Mr. Collier providing either of these reasons for needing background information on the purchasers. This court does not find the testimony of either Mr. or Mrs. Collier credible as to this issue.

Burt did not have the information that Mr. Collier was seeking but he gave Mr. Collier Tatum's phone number and Mr. Collier called Tatum. During that call, Mr. Collier again requested the buyers' names, social security numbers, their places of employment, and a copy of their drivers' licenses. When Tatum refused to give Mr. Collier the identifying information he was seeking, Mr. Collier became irate and again stated that he "did not want those kind of people" living at Camp Joy. Trial Transcript Vol. I at 130-32. Mr. Collier also threatened to refuse to provide utilities

---

[4]Mrs. Collier testified that she wanted Mr. Collier to obtain the personal information on potential purchasers at Camp Joy because she was particularly concerned about sex offenders living at the property. The Colliers' ten year old daughter would stay at the property with her father and Mrs. Collier was concerned for her daughter's safety. Mrs. Collier emotionally explained to the court that she had been sexually abused as a child and was concerned for her daughter. Although the testimony was compelling, the court is concerned about its veracity as it relates to the issue at hand. The Colliers both admitted that they did not conduct background checks on all potential renters or owners at Camp Joy. This fact alone refute Mrs. Collier's testimony. However, even more telling is the fact that there was a registered sex offender residing at Camp Joy and both of the Colliers knew about him.

to the buyers. See id. at 152. Like Burt, Tatum also presumed that Mr. Collier was referring to African Americans when he referred to "those kind of people." Interestingly, Tatum did not clarify to Mr. Collier that her clients where white. Notably, both Burt and Tatum concluded, independent of each other and based on different phone calls, that Mr. Collier's comments about "those kind of people" were based on race. Again, Mr. Collier testified that he specifically mentioned wanting to exclude sex offenders and drug dealers. Trial Transcript Volume II at 235. Tatum had no recollection of any mention of sex offenders or drug dealers.

The testimony regarding what happens next diverged. According to Tatum, she informed the Bennetts about her conversation with Mr. Collier but did not mention anything about her suspicion that Mr. Collier's comments were racially motivated. See Trial Transcript Vol. I at 154. The Bennetts were still willing to go through with the sale and they signed an acknowledgment to that effect on October 4, 2004. See id. at 140. Mrs. Bennett, however, testified that Tatum only mentioned something about utility fees and homeowners' dues prior to the Bennetts signing the document. See id.

Tatum testified that she later learned from Burt that the Tuckers had told Burt that Mr. Collier had changed the locks on the Tuckers' home and had taken down the for sale sign.[5] See Trial Transcript Vol. I at 140. At that point, Tatum testified that

---

[5]Tatum's testimony was also inconsistent with other evidence. Tatum testified that the water had been cut off and the locks had been changed before the Bennetts withdrew from the contract. The Colliers assert that these inconsistencies cast doubt on the accuracy of Tatum's memory and her lack of recollection that Mr. Collier

she informed the Bennetts of the actions by Mr. Collier and recommended that they withdraw from the contract, which they did. See id. Mrs. Bennett, however, testified that Tatum told her about the remarks made by Mr. Collier regarding "those kind of people" and her perception of racial overtones and that Tatum's report of the remarks was the reason the Bennetts withdrew from the contract. See id. at 197.

On October 12, 2004, the Bennetts withdrew their offer to purchase 4512 Camp Joy Road. The Bennetts terminated their offer in a written document that read: "David L. Bennett & Nicole L. Bennett chose to withdrawl [sic] from the contract offer due to the degrading actions, threats, & comments of the land owner on Camp Joy Rd. We chose not to go through because we did not want to deal with these for any extended period of time!" Trial Ex. 6.

After learning about the Bennetts' withdrawal from the sale, Mrs. Tucker sent a check for October rent to Camp Joy Marina. On or about October 22, 2004, movers from Smith's Moving Company arrived at 4512 Camp Joy Road at the direction of the Tuckers to pack and ship the Tuckers' possessions to their home in Arkansas. In the interim, Mr. Collier contacted his attorney to take action to take possession of the Tucker home for allegedly a default in the terms of the lease. This action was taken despite the fact that the contract specifically provided:

> If Purchaser fails to pay said lease by the monthly due date

---

mentioned sex offenders and drug dealers during their conversation before referring to "those kind of people." Record Document 53 at 13. The court disagrees, and instead finds that these inaccurate recollections reflect the memory of a person in the business of showing numerous pieces of real estate to multiple clients.

and go more than 30 days past due, Seller may exercise eviction rights.

Trial Ex. 1. Mr. Collier's attorney wrote to the Tuckers on October 29, 2004. <u>See</u> Trial Ex. 3. In the letter, the attorney advised the Tuckers that Camp Joy had taken possession of the Tuckers' house because of non-payment of rent and due to abandonment of the premises. <u>See id.</u> The thirty days provided for in the contract had clearly not yet expired at this point.

Sometime between October 22, 2004, and October 31, 2004, Mr. Collier caused the locks to be changed at 4512 Camp Joy Marina, and the "for sale" sign to be removed.[6] Mr. Collier also removed the realtor lock box. When the Tuckers arrived at Camp Joy on October 29 to obtain the remainder of items they had left in their home, they had not yet received the letter from Mr. Collier's attorney. They instead arrived to find that the locks on their home had been changed and that the "for sale" sign had been removed. After the Tuckers returned to Arkansas, they received the letter from Mr. Collier's attorney. Mrs. Tucker then stopped payment on the October rent check. The Tuckers never regained control of 4512 Camp Joy Road. They were never refunded any of their down payment or monthly payments to Camp Joy Marina.

## B.   Policy Of Excluding Through Other Actions.

The testimony established that Mr. Collier consistently expressed his

---

[6]The timing of this event clearly occurred after the Bennetts had withdrawn from the contract instead of prior to the withdrawal, as testified to by Tatum. <u>See</u> <u>supra</u> fn. 3.

displeasure with having African Americans at his property. As previously mentioned, Mr. Tucker testified that Mr. Collier expressly told him, "Don't sell to blacks, there will be no blacks at Camp Joy Marina." Transcript of Mr. Tucker's Video Deposition at 12. Although Mr. Collier denied making this statement, the court again notes that it finds Mr. Tucker's testimony to be more credible. See Trial Transcript Vol. II at 226.

Terry Watts ("Mr. Watts") was another witness called by the government. Mr. Watts does masonry work. He moved to Louisiana in 1999 to do masonry work for Whitaker Construction and brought a crew of fourteen to fifteen men with him. He and his crew initially rented motel rooms, but they eventually moved to Camp Joy Marina. See Trial Transcript Vol. I at 59. Mr. Watts ultimately rented six cabins at Camp Joy. He also decided to lease and operate the bar and restaurant at Camp Joy Marina, after he had lived there for around six to seven months.

In 2004, Mr. Collier and Mr. Watts became involved in a dispute that resulted in Mr. Collier tendering a five-day eviction notice to Mr. Watts for the bar and restaurant. The dispute had evolved from a construction project that the two men had worked on together. Mr. Collier was angry because he believed that Mr. Watts was bidding work against him, so Mr. Collier fired Mr. Watts from the construction project. This led to an ownership dispute over scaffolding that had been purchased together by the men.[7]

---

[7]The defendants contend that Mr. Watts is "extremely biased" against Mr. Collier. Record Document 53 at 22. While it is true that the two men had a turbulent

When Mr. Watts was asked by the government whether he was aware of any policies that Mr. Collier had regarding African Americans at Camp Joy Marina, he responded that Mr. Collier "didn't want no one of color on his property." Trial Transcript Vol. I at 69. When asked how he learned about this policy, Mr. Watts explained that Mr. Collier expressly told him about the policy:

> Q:   When did Mr. Collier tell you about that policy?
>
> A:   I had some African Americans come down as customers, and he come told me that -- he heard it and he come the next day and told me that he didn't want them on his property. But that isn't the words he used.
>
> Q:   What were the exact words Mr. Collier used?
>
> A:   He said he didn't want no damn niggers on his property.

Id. Mr. Collier denied making this statement. See Trial Transcript Vol. II at 218. The government's questioning of Mr. Watts continued and revealed another telling exchange between Mr. Watts and Mr. Collier:

> Q:   Did you -- were you made aware at any other point of Mr. Collier's policy regarding African Americans?
>
> A:   Yes, I was.
>
> Q:   And how at other times were you made aware of that policy?
>
> Q:   As I was moving my crew in there -- I was getting cabins as they

---

history of business dealings, this court, after listening and evaluating both the testimony of Mr. Watts and Mr. Collier, accepts the testimony of Mr. Watts as more credible. The defendants' attempts to discount Mr. Watts's testimony are unavailing.

come available. And I was moving men out of the motel rooms, which generally was two men in each room with double beds. And we finally got another cabin ready, and I brought some men over there. And they was black people. And he seen that, and he come told me they wasn't living there.

A:    What, exactly, did Reggie Collier say --

Q:    He said, "There's no niggers gonna live on this property, in these cabins."

Trial Transcript Vol. I at 70 [sic]. The questioning of Mr. Watts continued:

Q:    You testified earlier that a few months after you started operating the bar and restaurant Mr. Collier made you aware again of his policy regarding African Americans. Did he at any point after that tell you on any other occasions about his policy regarding African Americans?

A:    Yes, he did.

Q:    About how many times did he tell you about that policy?

A:    Two to three times. And then he had other people come tell me.

Q:    What, exactly, did Mr. Collier say on the other occasions he told you about his policy?

A:    Repeated his self, except a little more -- a little more unkind with his words and what have you.

Q:    What did --

A:    Towards me for continuing to let them come.

Q:    What exact words did he use to you?

A:     He did not want no niggers on his property and he meant it.

Q:     Did he give you --

A:     And he threatened to pull my lease.

Q:     I'm sorry?

A:     He threatened to pull my lease.

Q:     He threatened to pull your lease for what?

A:     If I allowed African Americans come on the property.

Id. at 71-72. Mr. Watts also testified that he lived at Camp Joy Marina for about four years and that he never saw any African Americans living there. See id. at 73 and 75.

Tyler Watts was also called as a witness by the government. Tyler Watts is the son of Mr. Watts. Tyler Watts moved to Shreveport and lived with his father at Camp Joy Marina. Tyler Watts also worked at the Camp Joy Marina Bar. While working at the bar, Tyler Watts heard Mr. Collier tell his father, "I do not want any niggers on my property." Trial Transcript Vol. I at 104. Tyler Watts also heard Mr. Collier out on the deck area of the bar stating, "You niggers need to get off of my property." Id. at 106. Tyler Watts testified that Mr. Collier made these statements to some African American patrons who were coming up from the deck to the back of the bar. Tyler Watts further testified:

> When we would have African American patrons come inside the bar, he would start saying derogatory terms loud enough to where they could overhear him, things such as "you niggers shouldn't be here," and just a magnitude of things on that level.

13

Id. at 106-07.  When asked if he recalled any specific incidents when Mr. Collier made comments like the one just described, Tyler Watts responded: "Specific? Just about every time that African Americans would come in the bar, he would just start spurting 'nigger' very loudly to where they could hear." Id. The questioning of Tyler Watts by the government continued:

> Q: Mr. Watts, did you ever hear Reggie Collier say anything directly to your father about excluding African Americans from Camp Joy?
>
> A: Yes, I did.
>
> Q: And what did you hear Mr. Collier say to your father?
>
> A: It was just simply, "I would" -- "I do not want any niggers on my property."

Id. at 108-09.  Tyler Watts also testified that he did not ever see any African Americans living in cabins at Camp Joy Marina during the two and a half years that he lived there. See id. at 109-10. In addition, the testimony established that between 2002 and October of 2004, no black person owned or leased a cabin at Camp Joy Marina.[8]

---

[8]However, the testimony differed regarding whether a black person ever lived at Camp Joy Marina.  As mentioned, both Mr. Watts and Tyler Watts testified that neither saw an African American living at Camp Joy Marina while they resided there. Mr. and Mrs. Collier testified that a black male by the name of "Roderick" lived at Camp Joy Marina as a roommate of a person named Brandon Severance.  Brandon Severance was the nephew of Mrs. Collier.

## C.    Complaint, The Response And The Lawsuit.

On November 4, 2004, the Tuckers filed a complaint with the United States Department of Housing and Urban Development ("HUD"), alleging that the Colliers discriminated against them in violation of the Fair Housing Act ("FHA") by interfering with the sale of their townhouse because of the race of the buyers. On November 15, 2004, Mrs. Collier wrote to HUD in response to the claim made by the Tuckers. See Trial Ex. 14. In her letter, Mrs. Collier stated, in pertinent part, that Mr. Collier

> did contact the real estate agent in an effort to explain to the agent that Camp Joy Marina, Inc. has various agreement forms that potential buyer's and/or renter's must sign before the marina provides services to them. . . . [Mr. Collier] also tried to explain to the agent that Camp Joy Marina, Inc. was the actual owner of the property, not the Tucker's. The agent would need to know this because when it came down to an actual sell, the buyer would really be buying it from the marina. The agent would not acknowledge this information.

Id. (errors in original). Notably, there was no mention whatsoever of the purported need to acquire background information about the potential buyers to conduct a background check on them for any reason. The letter made no mention of concerns regarding sexual predators or criminals of any kind, nor that the Colliers were concerned for the safety of their young daughter. See id.

As required by the FHA, the Secretary of HUD conducted an investigation of the Tuckers' complaint, attempted conciliation without success, and prepared a final investigative report. The Secretary determined that reasonable cause existed to

15

believe that illegal discriminatory housing practices had occurred, pursuant to 42 U.S.C. § 3610(g). Therefore, on or about April 16, 2008, the Secretary issued a Determination of Reasonable Cause and Charge of Discrimination, charging the Colliers with discrimination on the basis of race in violation of the FHA. On April 20, 2008, Mrs. Tucker elected to have the claims asserted in HUD's Charge of Discrimination resolved in a federal civil action pursuant to 42 U.S.C. § 3612(a). On April 22, 2008, the Chief Administrative Law Judge issued a Notice of Election and terminated the administrative proceeding on the HUD complaint filed by the Tuckers. Following this Notice of Election, the Secretary of HUD authorized the Attorney General to commence a civil action, pursuant to 42 U.S.C. § 3610(o).

## II. CONCLUSIONS OF LAW

The government filed a two-count complaint against the Colliers alleging (1) that the Colliers violated sections 3604(a), (b), and (c) and section 3617 of the FHA when Mr. Collier discriminated against the Tuckers and (2) that the Colliers engaged in a pattern or practice of resistance to the full enjoyment of rights protected by the FHA or denied to a group of persons rights granted by the FHA under 42 U.S.C. § 3614(a) and injured the Tuckers, Burt, Tatum and Mrs. Bennett.

The government contends that Mr. Collier caused the proposed sale from the Tuckers to the Bennetts to fail and, in the process, violated 42 U.S.C. §§ 3604(a), (b), (c), and 3617 by his course of conduct in connection with the proposed sale of the Tuckers' home. The Colliers counter that Mr. Collier never refused to negotiate or "otherwise make unavailable" a dwelling to the Bennetts. See 42 U.S.C. § 3604(a).

16

Mr. Collier did, however, request identifying information, including names, social security numbers and driver's license numbers, for the Bennetts as a condition to executing a deed on behalf of Camp Joy Marina. The testimony was consistent as to this request. The Colliers attempt to conclude that no violation of section 3604(a) occurred because no witness testified that Mr. Collier would have refused to execute a deed to the Bennetts had the information been provided. This conclusion is specious at best.

The Colliers are, however, correct that there is no *direct* evidence that Mr. Collier knew or thought that either Tatum or the Bennetts were black. The government asserts that this court can infer from all of the circumstances that Mr. Collier thought that the prospective purchasers were black. The testimony of Tatum and Bennett revealed that many unidentified persons observed Tatum and Bennett on both visits to the Tuckers' home. In addition, the evidence indicated that the Tuckers' home was visible from Mr. Collier's residence. Most telling is that the evidence established that Mr. Collier behaved differently with respect to the sale of the Tuckers' home than he had with respect to the sale of any other home at Camp Joy.

As the parties are well aware, there are two types of evidence: direct evidence and circumstantial evidence. Indirect evidence is defined as the proof of circumstances that tend to prove or disprove the existence or nonexistence of certain other facts. It is well established that the law makes no distinction between direct and circumstantial evidence, but simply requires that the factfinder find the facts from a preponderance of all the evidence, both direct and circumstantial.

17

The government points out that Mr. Collier was frequently at Camp Joy Marina and moved about the property. Mr. Collier also resided at Camp Joy. The government, therefore, concludes that Mr. Collier must have seen Tatum and must have believed that she was the purchaser. There is, admittedly, no *direct* evidence before the court that Mr. Collier was at Camp Joy Marina at the time of either visit by Tatum.[9]

Although the Colliers suggest that Mr. Collier did not think that the purchasers were black, there is indirect evidence to the contrary. For example, Anita Shows ("Shows"), a real estate agent who sold properties at Camp Joy Marina, testified that she was not aware of any background checks related to her sales at Camp Joy Marina. The Colliers try to distinguish this fact by pointing out that the Colliers already knew the prospective purchasers in the sales involving Shows and that they were friends with Shows, so they perceived that they had access to the information if they needed it. However, one of the questions before the court is *why* the Colliers would need such information or why they would need it in this instance as opposed to other instances when no requests were made.

The government is not required to establish that the denial of housing was motivated solely by racial discrimination. See Marable v. H. Walker & Assoc., 644 F.2d 390, 395 (5th Cir. 1981) (citing four other Fifth Circuit cases for this

---

[9]The Colliers claim that a person who saw Tatum with a white couple when the white female was visibly pregnant would assume that it was the couple who would be the prospective purchasers. On the second visit, according the testimony, Tatum was accompanied by both of the Bennetts and another white person.

proposition). "It is sufficient that race was one significant factor considered by the defendants . . . ." United States v. Pelzer Realty Co., 484 F.2d 438, 443 (5th Cir. 1973).

This court concludes that the defendants asserted reasons for Mr. Collier's actions are a pretext for racial discrimination. The comparative evidence of the unequal treatment by Mr. Collier in this instance as opposed to other instances of sales or rentals at Camp Joy Marina demonstrate that the defendants' reasons for Mr. Collier's actions are a pretext. The information requested by Mr. Collier as to the sale of the Tuckers' home was shown by the testimony to be subjective, especially when compared to other transactions. Furthermore, the defendants admitted that no black person had ever owned or leased a townhome at Camp Joy Marina.[10] The unequal application of criteria by Mr. Collier demonstrates disparate treatment on the basis of race in violation of the FHA.

"The provisions of 42 U.S.C. § 3604 are to be given broad and liberal construction, in keeping with Congress' intent in passing the Fair Housing Act of replacing racially segregated housing with 'truly integrated and balanced living patterns.'" Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 211, 93 S. Ct. 364, 368 (1972) (quoting statement of Senator Mondale, 114 Cong. Rec. 2706). "It is no defense . . . under the Fair Housing Act that racial animus was not a defendant's sole

---

[10]This has been found to be a significant evidentiary factor in other housing discrimination cases. See United States v. Reddoch, 467 F.2d 897, 889 (5th Cir. 1972) and United States v. West Peachtree Tenth Corp., 437 F.2d 221 (5th Cir. 1971).

reason for denial of housing.  Plaintiff[s] need only prove that race was one significant factor in defendant's dealings with them in order to establish a violation of the Fair Housing Act."  Woods-Drake v. Lundy, 667 F.2d 1198, 1202 (5th Cir. 1982) (citing numerous Fifth Circuit cases in support).  As in Woods-Drake, the record in this case clearly shows that race was a significant factor in the actions of Mr. Collier.

### A.     42 U.S.C. § 3604(a) And § 3604(b).

In its complaint, the government first alleged that the Colliers violated 42 U.S.C. § 3604(a).  This section makes it unlawful "to refuse to sell or rent after the making of a bona fide offer, to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race [or] color." 42 U.S.C. § 3604(a).  Prohibited practices under this section include imposing different sales prices for the sale of a dwelling, using different qualification criteria, and evicting tenants, because of their race.  See 24 C.F.R. § 100.60(b).  A discriminatory act that prevents a person from selling or buying residential property may state a claim under section 3604(a).  See Evans v. Tubbe, 657 F.2d 661, 663 n.3 (5th Cir. 1981).  Although the Tuckers are white, the government asserts that Mr. Collier's conduct injured the Tuckers.  Moreover, the Fifth Circuit has held that denying whites housing because of their association with African Americans violates the FHA.  See Woods-Drake, 667 F.2d at 1200-01.

The government next alleges that the Colliers violated section 3604(b) of the FHA, which makes it unlawful "[t]o discriminate against any person in the terms,

20

conditions, or privileges of sale or rental of a dwelling . . . because of race [or] color."
42 U.S.C. § 3604(b). Prohibited practices under this section include using different
provisions in leases or contracts, and failing to process an offer for the sale of a
dwelling because of race.   See 24 C.F.R. § 100.60(b).   Instituting different
requirements for prospective purchasers because of their race can be a violation of
section 3604(b). See Pelzer Realty, 484 F.2d at 444.

The government contends that Mr. Collier interfered with the sale of 4512
Camp Joy Road because of the presumed race of the buyers and that he made housing
unavailable to the Tuckers and the Bennetts by (1) making discriminatory statements
and threatening to refuse to provide water and sewage services, (2) applying different
criteria, based on race, and (3) ultimately forcing the Bennetts to back out of a sale
to which they had agreed.  The court agrees and finds that Mr. Collier's actions
violated section 3604(a) by effectively making housing unavailable to the Tuckers
and the Bennetts because of race.

The government further alleges that Mr. Collier violated section 3604(b) by
demanding identifying information on the Bennetts so a background check could be
conducted on them.  The testimony before the court, including that by both Mr. and
Mrs. Collier, illustrated that demanding this type of information was not the standard
practice of Mr. Collier or anyone at Camp Joy.  Both Mr. and Mrs. Collier admitted
that no request for information was made when Wilson, a white woman, offered to
purchase 4512 Camp Joy Road. Mrs. Collier admitted that in ten years of living at
Camp Joy Marina, she conducted only five background checks and that she did not

21

do a background check on every person who leased or purchased a home at Camp Joy Marina. <u>See</u> Trial Transcript Vol. II at 299-300. By imposing this additional qualification to purchase a property at Camp Joy Marina, Mr. Collier imposed a different term or condition on the sale of property on persons he believed to be African American in violation of section 3604(b).

**B.    42 U.S.C. § 3604(c).**

Section 804(c) of the Fair Housing Act makes it unlawful:

to make, print, or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation or discrimination.

42 U.S.C. § 3604(c). As to this issue, the court is presented with a credibility decision.

The government contends that the facts set forth establish that Mr. Collier violated section 3604(c). He told both real estate agents that he did not want the property to be sold to "those kind of people." He made a similar but more clear statement to Mr. Tucker. As previously mentioned, Mr. Tucker testified: "I told him that I was going to list it with a real estate agent. And he informed me that if I did, that I could not sell it to blacks, that there would be no blacks at Camp Joy Marina." Transcript of Mr. Tucker's Video Deposition at 12. Mr. Collier, of course, denied making the statement to Mr. Tucker. However, this court has already found Mr. Tucker's statement to be more credible.

22

The government also contends that Mr. Collier made statements to Mr. Watts with respect to the rental of a dwelling at Camp Joy Marina, indicating an intention to exclude blacks from renting cabins at Camp Joy, in violation of section 3604(c). Mr. Watts testified that Mr. Collier told him that no blacks would be allowed to live in the cabins at Camp Joy Marina.  Mr. Tucker, Mr. Watts and Tyler Watts all testified to statements made by Mr. Collier that established that it was Mr. Collier's policy, and the policy of Camp Joy Marina, through his actions, to exclude African Americans from Camp Joy.

As the government succinctly and accurately argued, "[i]n making these statements, Mr. Collier did not simply express a preference about the kind of neighbors or community that he wanted, but he affirmatively threatened, and had the power, to prevent 'those kind of people' from moving in by turning off water and sewer services."   Record Document 50 at 34.   This court agrees with the government's assertion that the statements of Mr. Collier when viewed as a whole express Mr. Collier's intent to prevent African Americans from buying property or living at Camp Joy Marina.  Thus, this court concludes that Mr. Collier's statements constitute a violation of section 804(c) of the FHA.

**C.**   **42 U.S.C. § 3617.**

Section 818 of the FHA makes it:

unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by

23

section 803, 804, 805, or 806 of this title.

42 U.S.C. § 3617. Mr. Collier's demands for background information on the buyers of 4512 Camp Joy Road, threats to refuse to turn on water and sewer services, and repeated statements that he would not allow "those kind of people" to live at Camp Joy Marina interfered with the sale of 4512 Camp Joy Road in violation of section 818 of the FHA.

**D.    42 U.S.C. § 3614(a).**

Count two of the government's complaint alleges that the defendants injured Burt, Tatum and Mrs. Bennett, as well as the Tuckers, when they violated section 3614. Under section 3614(a), the Attorney General may obtain relief upon a finding that the FHA has been violated, and that either (1) there has been a "pattern or practice of resistance to the full enjoyment of any rights granted by [the FHA]," or (2) where a violation of the FHA denies a group of persons rights guaranteed under the FHA and the Attorney General certifies that the denial raises an issue of general public importance. 42 U.S.C. § 3614(a).

To establish a pattern or practice of discrimination, the government must prove that the defendants either (1) engaged in repeated, individual acts of discrimination or (2) maintained a discriminatory policy. See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 360, 97 S. Ct. 1843, 1867 (1977). "The words 'pattern or practice' were not intended to be esoteric words of art. There is nothing magic in their meaning." United States v. West Peachtree Tenth Corp., 437 F.2d 221, 227 (5th Cir. 1971) (citation omitted). "The number of blacks actually turned away or

24

discriminated against is not determinative." Id. (citation omitted). However, the discrimination must result from more than an isolated or accidental or peculiar event. See id. However, "[n]o mathematical formula is workable, nor was any intended. Each case must turn on its own facts." Id.

The government contends that it has proven that Mr. Collier "both engaged in repeated, individual acts of discrimination and maintained a discriminatory policy" by interfering with the sale of the Tuckers' home as part of a pattern or practice of excluding African Americans from Camp Joy. Record Document 50 at 36-37. The government further refers to Mr. Tucker's testimony that Mr. Collier told him not to sell his home to an African American, evidence that Mr. Collier threatened to cut off utility service for the prospective purchasers of the Tuckers' home because he did not want "those kind of people" at Camp Joy, and testimony from Mr. Watts and his son that Mr. Collier told them on numerous occasions not to permit African Americans at the marina and restaurant in support of the existence of a policy.

The Colliers, in their post-trial brief, attempt to distract the court from the issue by stating that "there still is not a single African American who testified that he or she was denied the righ[t] to purchase or rent a dwelling by Mr. or Mrs. Collier." Record Document 53 at 25. The Colliers then devote time to the specious argument that "the best evidence that there was no pattern or practice of racial discrimination in housing" is the "total lack of any response to newspaper advertisements" the government ran in Shreveport and Bossier City. Id. at 26. The advertisement stated:

If you believe you or someone you know has tried to rent or purchase

25

property at **Camp Joy Marina Residential Community**, but was discouraged or prevented from doing so because of race, the Department of Justice would like to talk with you.

Trial Exhibit D-2. The government did not receive any responses. However, the court is well aware that many people do not subscribe to the newspapers in which the government ran its ads. Logic does not thus dictate that the absence of a response indicates a lack of a pattern or practice of discrimination. The Colliers then conclude that "the major part of the 'pattern or practice' case rests on uncorroborated statements of persons with substantial motives to harm Mr. or Mrs. Collier or to benefit themselves financially, and no other victims." Id. at 27. While this argument may be true in the abstract, this court was called upon as the trier of fact to make credibility determinations following the presentation of evidence and has concluded that the testimony of Mr. and Mrs. Collier is simply not credible. In addition, the Colliers' own witness, Lester Bush, an African American male, testified that Camp Joy Marina is not the "type of place where [an African American] would probably hang out." Trial Transcript Vol. 2 at 204.[11]

Mr. Collier's actions and statements were "a disingenuous scheme or device to exclude blacks . . . and [are] additional evidence of a . . . pattern or practice of

---

[11]The government also asserts that a single, isolated incident may entitle it to relief where a group of persons is denied rights under the FHA, citing a district court case from the Northern District of Ohio. This court need not reach the question of whether there was reason to believe that a group of persons had been denied rights by the FHA in view of this court's finding that a pattern or practice of discrimination existed. See Pelzer Realty Co., 484 F.2d at 445.

racial discrimination." West Peachtree, 437 F.2d at 228. Mr. Collier's actions regarding the Tucker transaction were a departure from normal practice. Mr. Collier's demand for background information was discriminatory treatment and this discriminatory treatment was racially motivated. As the district court found (and the Fifth Circuit quoted) in United States v. Pelzer Realty Company, Inc., 484 F.2d 438, 443 (5th Cir. 1973), "these circumstances would not have occurred in a proposed sale to a white." Additionally, this case is not based upon a single remark or an offhand comment made to one person on a single occasion. The actions taken by Mr. Collier occurred over a period of time and to different people. "[I]t is not necessary to show that [Mr. Collier] intended to deprive [anyone] of rights granted by the Act. A violation occurred because his words had that effect." Pelzer Realty Co., 484 F.2d at 443 (citations omitted).

## III. DAMAGES

### A.   The Tuckers.

Having concluded that the defendants violated the FHA, the court now turns to the issue of damages. The financial loss to the Tuckers was $14,107.67, the amount they would have received from the sale to the Bennetts, less commission and related charges, plus the amount of the stop payment order on their check for October rent, which was $16.00. The Tuckers are also entitled to the amount of $1,099.98 in advance lot-rental payments for which they had not yet received the benefit. The Tuckers also testified as to loss of property inside of their home at 4512 Camp Joy. However, there was no testimony or evidence as to the value of that property. Thus,

27

the court believes that the amount of $500 is sufficient in light of the lack of supporting evidence as to the value of the property.

The Tuckers also testified to emotional distress that they suffered due to the discrimination by Mr. Collier. The testimony of both Mr. and Mrs. Tucker can, without question, be categorized as emotional. However, the emotional distress suffered by the Tuckers was not solely based upon violations of the FHA. Instead, it was largely based upon their business dealings with Mr. Collier. In light of their testimony, the court awards emotional distress damages to Mr. and Mrs. Tucker in the amount of $3,000.00 each, for a total of $6,000.00. Therefore, the total amount of damages awarded to the Tuckers is $21,723.65.

**B.      Tatum.**

The financial loss to Tatum is the loss of her share of the commission on the potential sale of the Tuckers' house, or $1,650.00. With respect to emotional distress suffered by Tatum, the court is cognizant of her testimony regarding her single phone call with Mr. Collier, and the lasting effects of the conversation. However, the court is not swayed that this brief encounter rises to the level of compensable emotional distress damages. Thus, the court declines to award Tatum any damages for emotional distress.

**C.      Burt.**

The financial loss to Burt is the loss of his share of commission on the sale of the Tuckers' house, or $1,650.00, plus the loss of property, specifically the lock box and sign, worth approximately $245.00, for a total of $1,895.00.

**D.    Mrs. Bennett.**

The government asserts that Mrs. Bennett is entitled to damages for emotional distress.  However, the testimony given by Mrs. Bennett does not lead this court to conclude that any emotional distress suffered by her rises to the level of compensable.  Therefore, the court declines to award damages to Mrs. Bennett.

**E.    Mrs. Collier's Liability.**

The Colliers acknowledge

> that, if the Court finds that Mr. Collier violated the Fair Housing Act, Camp Joy Marina, Inc., would be vicariously liable for the compensatory damages awarded to the aggrieved parties.  Moreover, Mrs. Collier, although not directly liable for any asserted damages personally, would be liable for the compensatory damages that Camp Joy Marina, Inc., is obligated to pay by virtue of her being the sole shareholder of the corporation and having assumed the obligations of the corporation by dissolving the corporation by affidavit in accordance with La. R.S. 12:142.1.

Record Document 53 at 32.  Thus, Mrs. Collier is, by admission, vicariously liable for the compensatory damages.

**F.    Civil Penalties.**

The government also seeks civil penalties in this case pursuant to 42 U.S.C. § 3614(d)(1)(C)[12] and 28 C.F.R. § 85.[13]  The Colliers contend that "in light of the

---

[12]This section instructs as to the relief which may be granted in civil actions under subsections (a) and (b) by stating that the court:

(C)  may, to vindicate the public interest, assess a civil penalty against the respondent--

(i)   in an amount not exceeding $50,000, for a first

relatively small economic loss, and the fact that this would be the first adjudication of discrimination by Mr. Collier, any civil penalty should not exceed $10,000, the amount that could have been awarded in civil penalties by an administrative law judge pursuant to 42 U.S.C. § 3612(g)(3)(A)." Record Document 53 at 33. The government, however, seeks a civil penalty in the amount of $55,000. The court finds that a civil penalty in the amount of $25,000 is warranted in this case.

## G. Punitive Damages.

The government also seeks an award of punitive damages. "[T]he question for the availability of punitive damages is whether the defendant[] acted with malice or reckless indifference that [his] actions might violate a federal statue of which [he was] aware." Lincoln v. Case, 340 F.3d 283, 291 (5th Cir. 2003) (quotations and citation omitted). The court finds that punitive damages are not warranted in this case.

## H. Remaining Forms Of Relief.

The government also seeks various other forms of relief, including injunctive relief and mandatory education. The court finds that injunctive relief is warranted and the judgment will reflect such relief. All other forms of relief sought by the government are denied.

A judgment consistent with the terms of this Memorandum Ruling shall issue

---

violation. . . .

42 U.S.C. § 3614(d)(1)(C).

[13]This section increased the amount of civil penalties available from $50,000 to $55,000. See 28 C.F.R. § 85.3(b)(3).

herewith.

    **THUS DONE AND SIGNED** at Shreveport, Louisiana, this _28th_ day of

September, 2010.

                             _____

                                JUDGE TOM STAGG